# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **PEARL LEE GLOVER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-cv-2229 (RBW/GMH)** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for full case management.  In this action, Pearl Lee Glover ("Plaintiff") seeks a reversal of the decision of the Commissioner of the Social Security Administration ("Defendant" or "SSA") denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act, 42 U.S.C. § 405(g).

Before the undersigned are Plaintiff's motion for judgment of reversal and Defendant's motion for judgment of affirmance.  Plaintiff contends that the final administrative decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence and that the ALJ improperly applied the law.  Upon review of the entire record,[1] the undersigned recommends that Plaintiff's motion be denied and Defendant's motion be granted.

---

[1] The relevant docket entries are (1) Memorandum in Support of Plaintiff's Motion for Judgment of Reversal ("Pl. Mot.") [Dkt 13]; (2) Defendant's Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt 14]; (3) Plaintiff's Reply in Support of Plaintiff's Motion for Judgment of Reversal and in Opposition to Defendant's Motion for Judgment of Affirmance ("Pl. Opp.") [Dkt. 18]; and (4) the Administrative Record ("AR") [Dkt. 9].  With the exception of the Administrative Record, all citations to page numbers within a particular document will be to the ECF docket page numbers for the document.  For the Administrative Record, citations will be to the Bates numbering appearing therein.

## BACKGROUND

### A. Factual Background

#### 1. Plaintiff Pearl Glover

Plaintiff was fifty-three years old at the time of her hearing before the ALJ. AR 48. She had completed 10th grade and began 11th grade. *Id.* at 48, 346. Plaintiff previously worked as a security guard, a nursing assistant/care aide, and a laborer. *Id.* at 247–252. Plaintiff has been unemployed since 2011. *Id.* at 222.

#### 2. Procedural History

On July 18, 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively. *Id.* at 207–219. She alleged her disability began on September 2, 2011, because of back pain and a thyroid condition. *Id.* at 103.

On September 13, 2012, the Commissioner denied Plaintiff's claims and determined that her current symptoms were not severe enough to prevent her from working. *Id.* Plaintiff requested reconsideration, but the Commissioner again denied her claims on March 26, 2013, citing medical evidence that showed Plaintiff's ability to perform work she had done in the past as a laborer. *Id.* at 115. The Commissioner granted her request for a hearing, which was held on April 30, 2015. *Id.* at 43–63, 119–20. On September 15, 2015, the ALJ denied Plaintiff's claims. *Id.* at 35–36. Plaintiff filed a request for review of the ALJ's decision by the Social Security Appeals Council on November 13, 2015, which the Appeals Council denied. *Id.* at 1–5, 15. The ALJ's decision therefore became the Commissioner's final decision. *See Ryan v. Bentsen*, 12 F.3d 245, 247 (D.C. Cir. 1993). Plaintiff commenced this action seeking reversal of the Commissioner's decision on November 8, 2016. Pl. Mot. at 1.

### 3.   The Administrative Record

As noted, an administrative hearing was held in this case before an ALJ.  AR 43–63.  During this hearing, Plaintiff testified and was represented by counsel.  *Id.* at 43.  The ALJ evaluated Plaintiff's symptoms based on evidence in the administrative record, including medical records and opinions, Plaintiff's statements, and testimony from a Vocational Expert ("VE").  The relevant portions of the administrative record are recounted below.

#### a.   Medical Treatment Evidence

##### i.   Treatment for Physical Impairments

On July 7, 2011, Plaintiff sought treatment for lower back pain from Dr. Madhu Henry of Unity Health Care, Plaintiff's primary medical provider.  *Id.* at 306.  Dr. Henry noted that Plaintiff had degenerative disc disease, pain in her spine, numbness, tingling, and weakness.  *Id.*  Plaintiff reported that her current medication, Neurontin,[2] "just makes her sleep and [she] needs something stronger."  *Id.*  Upon examination, Dr. Henry noted that Plaintiff's musculoskeletal inspection was normal and observed that Plaintiff was non-tender to palpation.  *Id.* at 307.  Dr. Henry prescribed Flexeril[3] and ibuprofen and recommended a follow-up appointment for August 5, 2011, for Plaintiff's back pain and possibly an MRI.  *Id.*

Plaintiff followed up with Physician Assistant ("PA") Trang Duong at Unity Health Care for her lower back pain on August 5, 2011.  *Id.* at 416.  PA Duong ordered a refill of ibuprofen and Flexeril and continued Plaintiff's Neurontin medication to treat her lower back pain.  *Id.* at 418.  PA Duong also referred Plaintiff to Howard University Hospital Radiology for an MRI to

---

[2] Neurontin is a brand name for an anti-epileptic or anti-convulsant drug.  *See* Neurontin, Drugs.com, https://www.drugs.com/search.php?searchterm=Neurontin+ (last visited Dec. 6, 2017).

[3] Flexeril is a brand name for a muscle relaxant.  *See* Flexeril, Drugs.com, https://www.drugs.com/robaxin.html (last visited Dec. 6, 2017).

evaluate her for degenerative disease and chronic back pain. *Id.* PA Duong told Plaintiff to follow up in three months. *Id.*

On November 28, 2011, Plaintiff received treatment at Unity Health Care with Dr. Michelle Rice-Green for lower back pain. *Id.* at 414. Plaintiff denied weakness and radicular symptoms. *Id.* Upon physical examination, Dr. Rice-Green found that Plaintiff had tenderness to palpation of her spine and a right-side spasm, full painless range of motion, negative straight leg-raising tests, and normal neurological findings. *Id.* Dr. Rice-Green prescribed Robaxin[4] and recommended exercise and heat. *Id.* at 415.

Plaintiff appeared for an appointment with PA Duong on January 27, 2012, to follow up on her thyroid disease. *Id.* at 412. Plaintiff complained of "persistent chronic pain" in her lower back. *Id.* PA Duong noted that Plaintiff had not yet received an MRI. *Id.* PA Duong assessed Plaintiff's degenerative disc disease and recommended that Plaintiff return after she received her MRI and saw an orthopedic specialist. *Id.* at 413.

Plaintiff presented for an appointment with PA Duong on April 20, 2012, to follow up on her thyroid disease and back pain. *Id.* at 409. An x-ray revealed that Plaintiff's lumbar spine was abnormal with degeneration. *Id.* PA Duong also noted that Plaintiff had still not received an MRI of her lumbar spine from her January 2012 referral. *Id.* To treat Plaintiff's lower back pain, PA Duong refilled her Robaxin and ibuprofen prescriptions, refilled and increased her Neurontin prescription, and referred her to United Medical Center Radiology for an MRI to evaluate her for degenerative disease and chronic back pain. *Id.* at 410. PA Duong advised Plaintiff to follow up six weeks after her MRI. *Id.*

---

[4] Robaxin is a brand name for a muscle relaxant. *See* Robaxin, Drugs.com, https://www.drugs.com/robaxin.html (last visited Dec. 6, 2017).

On June 5, 2012, Plaintiff underwent an MRI with United Medical Center, pursuant to PA Duong's referral. *Id.* at 388–389. Plaintiff's lumbar spine MRI revealed degenerative disc disease at L5 to S1 with a disc bulge and mild facet arthropathy[5] with mild to moderate neural foraminal narrowing.[6] *Id.*

Plaintiff followed up with PA Duong on June 8, 2012, after her MRI. *Id.* at 406. PA Duong reported that Plaintiff's MRI was positive for "degenerative disc disease and bulge at L5-S1." *Id.* at 406–07. PA Duong referred Plaintiff to Howard University Hospital Orthopedics for management of her "chronic back pain (with recent arm numbness) and abnormal MRI results." *Id.* PA Duong told Plaintiff to continue taking Robaxin and ibuprofen. *Id.* at 407.

At an appointment with PA Duong on July 3, 2012, Plaintiff complained of lower back pain. *Id.* at 404–05. PA Duong advised Plaintiff to keep her July 12, 2012 appointment with the orthopedist at Howard University Hospital and follow up afterwards for further care. *Id.* at 405.

On August 14, 2012, Plaintiff followed up with PA Duong after an orthopedic referral with Dr. Dapo Ajeyemi of Howard University Hospital. *Id.* at 402–03. Dr. Ajeyemi recommended Mobic[7] and physical therapy. *Id.* at 402. Plaintiff requested a second opinion. *Id.* PA Duong referred Plaintiff to the GW Medical Faculty Associates Orthopedic Surgery practice for evaluation and management of chronic lower back pain. *Id.* at 403. PA Duong told Plaintiff to continue with her Robaxin, ibuprofen, and Neurontin. *Id.*

---

[5] Facet arthropathy is arthritis of the facet joints, which "are the joints on the back of [the] spine that counterbalance the disks inside [the] spine's vertebrae." Recognizing the Symptoms of Facet Arthropathy, Healthline.com, https://www.healthline.com/health/facet-arthropathy#overview1 (last visited Dec. 6, 2017).

[6] Neural foraminal narrowing "occurs when the small openings between the bones of [the] spine, called the neural foramina, narrow or tighten." Neural Foraminal Stenosis, Healthline.com, https://www.healthline.com/health/neural-foraminal-stenosis#overview1 (last visited Dec. 6, 2017).

[7] Mobic is a brand name for a nonsteroidal anti-inflammatory drug. *See* Mobic, Drugs.com, https://www.drugs.com/search.php?searchterm=Mobic&a=1 (last visited Dec. 6, 2017).

On August 28, 2012, Plaintiff was examined by Dr. Warren Yu, an orthopedic surgeon at George Washington University Hospital. *Id.* at 431. Plaintiff had full (5 out of 5) motor strength throughout her upper and lower extremities, along with intact sensation and symmetrical reflexes. *Id.* Plaintiff's radiographic data showed mild degenerative changes in the cervical spine, but otherwise normal alignment. *Id.* X-rays of Plaintiff's lumbar spine showed some moderate degenerative changes and moderate stenosis.[8] *Id.* Dr. Yu noted in his report that Plaintiff had degenerative changes of both the neck and lower back. *Id.* Since Plaintiff had "not tried any conservative management," Dr. Yu recommended physical therapy. *Id.* Dr. Yu advised Plaintiff to follow up in three months for a reassessment. *Id.* If Plaintiff had not experienced improvement at the time of the follow up, Dr. Yu would then consider injections. *Id.*

In September 2012, Dr. Alex Hemphill, a State Agency physician, reviewed Plaintiff's medical record and found that Plaintiff was capable of performing light work with postural limitations. *Id.* at 76–77. Dr. Hemphill found that Plaintiff was able to lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and frequently climb stairs/ramps, balance, stoop, kneel, crouch, and crawl. *Id.*

Plaintiff followed up with Dr. Yu in February 2013 complaining of continued lower back pain. *Id.* at 430. Dr. Yu noted that he had "sent [Plaintiff] to physical therapy, however, she only went once." *Id.* Plaintiff reported that she was seeing her primary care physician for medical management of the pain, which included anti-spasm drugs and Meloxicam.[9] *Id.* While Plaintiff

---

[8] Spinal stenosis is "a narrowing of the open spaces within [the] spine, which can put pressure on the nerves that travel through the spine." Spinal Stenosis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Dec. 6, 2017).

[9] "Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID)." *See* Meloxicam, Drugs.com, https://www.drugs.com/search.php?searchterm=Meloxicam (last visited Dec. 6, 2017).

was tender to palpation in the paraspinal musculature, Dr. Yu found that Plaintiff was entirely neurologically intact in her lower extremities in terms of sensation and motor function. *Id.* Dr. Yu also found that Plaintiff's straight leg raise was negative bilaterally. *Id.* Dr. Yu told Plaintiff that "she needs to go [to physical therapy] multiple times in order to get the true benefit." *Id.* If Plaintiff completed a full course of physical therapy without improvement, Dr. Yu would then consider injections. *Id.*

There is no evidence in the record indicating that Plaintiff underwent further physical therapy to treat her lower back pain.

In March 2013, Dr. Eduardo Haim, another State Agency physician, reviewed Plaintiff's updated medical record. *Id.* at 87–88. Like Dr. Hemphill, Dr. Haim concluded that Plaintiff was capable of performing light work with postural limitations. *Id.*

On October 10, 2013, Plaintiff received a Home Health Care Plan from Global Healthcare. *Id.* at 333. The Plan indicated that Plaintiff was at risk of falling and walked with a cane. *Id.* The Plan provided Plaintiff assistance with dressing, foot care, ambulation, meal preparation, grocery shopping, washing clothes, and light housekeeping. *Id.* The Plan also stated that Plaintiff needed a medication reminder and someone to accompany her to medical appointments. *Id.*

In September 2014, Unity Health Care designated PA Alexandra Scheer as Plaintiff's Primary Care Provider. *Id.* at 339, 342. On March 24, 2014, PA Scheer wrote a letter "To Whom It May Concern" and stated that Plaintiff "has difficulty ambulating and performing her activities of daily living due to her chronic back pain and medical history of spine changes. Please allow her son to live with her to help her in her daily tasks." *Id.* at 337.

On November 5, 2014, Plaintiff underwent a lumbar spine MRI at George Washington University Hospital pursuant to orders by PA Scheer. *Id.* at 319–20. The attending radiologist,

Dr. Asif Ahmed, found that Plaintiff had multilevel degenerative changes and prominent dis-cogenic changes, a small left posterior annular fissure, and multilevel facet arthropathy with asso-ciated ligamentum flavum laxity[10] with fluid within the facet joint.  *Id.* at 320.

On March 26, 2015, PA Scheer completed a Medical Examination questionnaire form in which she indicated that Plaintiff had impairments that prevented her from working and restricted her activities.  *Id.* at 322.  PA Scheer indicated on the form that Plaintiff could not perform full-time or part-time work as a laborer, cleaner, care aid, recreational aide, or security guard.  *Id.* at 324.  PA Scheer did not list on the form any medical or clinical findings that supported her assess-ment of Plaintiff's identified limitations.  *Id.*

Plaintiff received an independent medical evaluation on April 3, 2015, from Dr. Philip Marion.  *Id.* at 327–331.  Dr. Marion is the Medical Director for Rehabilitation Services and Clin-ical Profession of Medicine and Neurology at the George Washington University Medical Center and is Board Certified in Physical Medicine and Rehabilitation, and Pain Medicine.  *Id.* at 444–445.  Dr. Marion reviewed Plaintiff's history of back pain, her occupational history, lifestyle, med-ical treatment, symptoms, medications, medical records, and conducted a physical examination. *Id.* at 327–331.

Dr. Marion found that Plaintiff "had full and active range of motion of all four extremities" and that "[t]here was no extremity atrophy or asymmetry."  *Id.* at 330.  Dr. Marion reported that Plaintiff had generalized muscle tenderness to palpation.  *Id.*  Dr. Marion observed that Plaintiff had full (5 out of 5) strength in both her upper and lower extremities.  *Id.*  Dr. Marion noted that Plaintiff's joints "did not demonstrate any significant clubbing, cyanosis or edema."  *Id.*

---

[10] The ligamentum flavum is "[o]ne of a series of bands of elastic tissue that runs between the lamina from the axis to the sacrum" and "serve[s] as a covering over the spinal column."  Ligamentum Flavum Definition, Spine-health, https://www.spine-health.com/glossary/ligamentum-flavum (last visited Dec. 6, 2017).

Dr. Marion opined that Plaintiff's back pain, spine disease, and position intolerance "pre-clude[] her from performing any occupational activity." *Id.* Dr. Marion further concluded that Plaintiff was "totally disabled with inability to perform work activities and difficulty with activities of daily living." *Id.*

ii. Treatment for Mental Impairments

In August 2014, Plaintiff sought treatment at Community Connections, Inc., reporting de-pression, lack of motivation, fatigue, insomnia, and auditory and visual hallucinations. *Id.* at 449–52. Plaintiff stated that she lived alone and frequently stayed at home due to pain in her legs and back. *Id.* at 451, 462. She indicated a history of substance abuse, but said that she had abstained from drugs for ten months at the time of the intake. *Id.* at 451. Plaintiff received a referral for therapy and medication management. *Id.* at 457.

On September 15, 2014, Plaintiff sought treatment with Dr. Brinda Krishnan, a psychiatrist at Unity Health Care. *Id.* at 339–40. Plaintiff reported auditory and visual hallucinations and social isolation. *Id.* at 339. Dr. Krishnan noted that Plaintiff was alert, neatly dressed, and had normal speech and good eye contact. *Id.* at 340. Dr. Krishnan further observed that Plaintiff was calm and cooperative, displayed a euthymic affect, and had grossly intact cognition. *Id.* Dr. Krish-nan found no evidence of psychotic symptoms. *Id.* Dr. Krishnan prescribed Sertraline[11] and Risperdal[12] for psychotic depression and advised Plaintiff to follow up in six weeks. *Id.*

On October 29, 2014, Plaintiff had a follow-up appointment with Dr. Krishnan. *Id.* at 342. Plaintiff reported that she continued to feel depressed and agitated and that she experienced social

---

[11] Sertraline is an antidepressant drug that "affects chemicals in the brain that may be unbalanced in people with depression, panic, anxiety, or obsessive-compulsive symptoms." *See* Sertraline, Drugs.com, https://www.drugs.com/search.php?searchterm=Sertraline+ (last visited Dec. 6, 2017).

[12] Risperdal is a brand name for an antipsychotic medicine that "works by changing the effects of chemicals in the brain." *See* Risperdal, Drugs.com, https://www.drugs.com/search.php?searchterm=Risperdal+ (last visited Dec. 6, 2017).

isolation.  *Id.*  Dr. Krishnan noted that Plaintiff did not display psychotic symptoms.  *Id.*  Dr. Krishnan prescribed an increase in Sertraline and Risperdal to treat Plaintiff's depressive symptoms, irritability, and auditory hallucinations, and recommended a follow-up in four weeks.  *Id.* at 343.

The ALJ sent Plaintiff for a mental consultative examination with Dr. Hoorie Siddique on July 1, 2015, following the administrative hearing.  *Id.* at 470–75.  Dr. Siddique found that Plaintiff was "oriented in all spheres" and "a pleasant forthcoming and friendly woman."  *Id.* at 470–71.  Dr. Siddique also reported that Plaintiff's "[s]ocial skills were average to above average," and "[t]here was no indication of disordered thinking or psychotic process."  *Id.*  Dr. Siddique concluded that Plaintiff's evaluation appeared to be "consistent with mild cognitive problems, but in itself this does not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis."  *Id.* at 474.  Dr. Siddique diagnosed Plaintiff with cognitive disorder, "[a]djustment disorder with mixed anxiety and depressed mood," and "[b]orderline to low average intellectual functioning."  *Id.* at 475.

b.  Plaintiff's Testimony

In an August 2012 function report, submitted as part of her application for benefits, Plaintiff stated that she performed personal care needs, prepared simple meals daily, completed light household chores, shopped in stores for food and household items, visited with family, socialized on the phone, and attended church and a weekly social group.  *Id.* at 259–63.  She reported that she was unable to walk two blocks or lift more than twenty pounds, and that she was unable stand or sit for more than thirty minutes.  *Id.* at 263.

At the administrative hearing on April 30, 2015, Plaintiff testified that she would fall if she walked without a cane and that she could not sit or stand more than thirty minutes.  *Id.* at 51.  She

also testified that she could not lift, push, pull, bend, or stoop, including that she could not lift five pounds for more than twenty minutes, push a vacuum or a lawnmower, pull weeds, or walk the premises of a grocery store. *Id.* at 51–53. In response to the ALJ's question on how she spent a typical day, Plaintiff reported:

> On a typical day, my son comes in; he gets me up in the morning. His girlfriend, she comes in. She cooks. She helps me in the bathroom, helps me bathe. She helps me dress. My son just puts my shoes on, ties my shoes. He cooks for me. Once I leave the breakfast table, I sit on the couch for a little bit, look at TV, take my medicine. Once I take the medicine, I get[] groggy and I lie back down and wakes back up [at] lunchtime. Basically just sits up for a little bit, looking at the TV and then rest the rest of the day until it's time for me to eat.

*Id.* at 50. She further stated that she did not engage in activities on a regular basis outside of home. *Id.*

Plaintiff asserted that both her left leg and right leg gave out on her, and that she experienced numbness in her left arm, pain in her lower back, thyroid issues, and depression. *Id.* at 53–54. She stated that the pain medication for her back "helps some, but the pain is constantly, so mostly, it will relax me." *Id.* Plaintiff also described that her depression medication made her "groggy." *Id.* at 55.

c. Vocational Evidence

i. VE Hearing Testimony

A VE also testified at the administrative hearing. *Id.* at 56–63. The ALJ asked the VE to consider the work available to a hypothetical person of Plaintiff's age, education, and work experience, who had the RFC for light work but required constant use of a cane when standing, walking, and balancing; and a sit-stand option; had physical functional limitations on reaching, handling, feeling, pushing and pulling frequently; had the ability to interact with supervisors, coworkers, and the public frequently and the ability to carry out simple and repetitive tasks; and could not tolerate

production pace requirements.  *Id.* at 57–58.  The VE replied that such a hypothetical person was capable of performing work as an office helper, counter clerk, and router.  *Id.* at 58.

Plaintiff's counsel then posed questions to the VE.  *Id.* at 59.  Plaintiff's counsel first asked whether that hypothetical person would be able to perform the officer helper job if they were not able to stand for more than thirty minutes in an eight-hour shift.  *Id.*  The VE answered that the hypothetical person would still be able to perform the officer helper position with the sit-stand position option.  *Id.*

Next, Plaintiff's counsel asked whether the hypothetical person would be able to perform the office helper position if she was not able to sit and stand for more than an hour in an eight-hour period.  *Id.* at 59–60.  The VE replied that the hypothetical person would not be able to perform the office helper position.  *Id.* at 60.

Plaintiff's counsel then asked whether the hypothetical person would be able to perform the office helper position if she was not able to carry more than twenty pounds in an eight-hour period.  *Id.*  The VE replied that the hypothetical person would be able to perform the office helper position.  *Id.*

Plaintiff's counsel asked how many office helper positions would allow Plaintiff to recline for seven hours per shift.  *Id.*  The VE answered that none of the positions identified would allow an individual to recline for seven hours during a shift.  *Id.*

Plaintiff's counsel then asked whether an individual would be able to perform the counter clerk position if she could not stand for more than thirty minutes in an eight-hour period.  *Id.*  The VE answered yes, and further stated that such a person would be able to perform the counter clerk position with a sit-stand option.  *Id.*

Plaintiff's counsel then asked if an individual would be able to perform the counter clerk position if she was not able to sit or stand for more than one hour total in an eight hour period.  *Id.* The VE replied that the individual would not be able to perform the counter clerk position.  *Id.* at 61.  The VE further stated that there would be no work available given this limitation, including any router position.  *Id.*

Finally, Plaintiff's counsel asked the VE whether the office helper position that the VE identified would require regular attendance.  *Id.*  The VE replied that all of the positions would require regular attendance to the extent that there are ten sick days allowed each year.  *Id.*

ii.  Nancy Forest

On March 23, 2015, Nancy Forest, a life care planner and vocational rehabilitation counselor, conducted a vocational evaluation with Plaintiff at the request of Plaintiff's counsel.  *Id.* at 345–53.  Based on a review of Plaintiff's medical records and an in-person assessment, Ms. Forest opined that Plaintiff was not capable of working in any capacity.  *Id.* at 345–53.

**B.  Legal Framework and the ALJ's Decision**

To be eligible for disability insurance benefits and supplemental security income under the Social Security Act, a claimant must be found to be "disabled" by the Social Security Administration ("SSA").  42 U.S.C. §§ 423(a), 1382.  In most cases, to determine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claimant using that evidence.  20 C.F.R. §§ 404.1520, 416.920.

To evaluate whether a claimant is disabled, the ALJ must determine whether:  (1) the claimant is "presently engaged in substantial gainful activity"; (2) the claimant has a "medically severe impairment or impairments"; (3) the claimant's impairment is equivalent to one of the impairments

13

listed in the appendix of the relevant disability regulations; (4) the impairment prevents the claim-

ant from performing her past relevant work; and (5) the claimant, in light of her age, education,

work experience, and Residual Functional Capacity ("RFC"), can still perform another job that is

available in the national economy. *Id.* An RFC is the assessment of what a claimant is able to do

notwithstanding her physical and mental limitations. *See Butler v. Barnhart*, 353 F.3d 992, 1000

(D.C. Cir. 2004).

The claimant bears the burden of proof in the first four steps of the evaluation. *Callahan*

*v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011). At step five, the burden of proof shifts to the

Commissioner to identify specific jobs available in the national economy that the claimant can

perform. *Id.* In making this determination, the ALJ may call a VE to testify as to whether a

claimant can perform other work that exists in significant numbers in the national economy. *Id.* at

90. The VE may draw her conclusion from a number of sources, including the Dictionary of

Occupational Titles ("DOT"). *Id.* The DOT, last published by the U.S. Department of Labor in

1991, provides a brief description of occupations within the national economy and lists the capa-

bilities that each occupation requires of a worker. *See generally* DOT, 1991 WL 645964. Along

with VE testimony, the SSA generally relies on the DOT to determine if there are jobs in the

national economy that a claimant can perform given her age, education, work experience, and

RFC. *See* 20 C.F.R. §§ 416.966–416.969. Based on this analysis, if there are no such jobs avail-

able, the claimant is deemed disabled; if there are jobs available to the claimant, she is deemed not

disabled.

Applying the five-step sequential evaluation, the ALJ found Plaintiff ineligible for disabil-

ity insurance benefits and supplemental security income benefits on September 15, 2015. *Id.* at

17–37.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 2, 2011, the alleged onset date.  *Id.* at 22.

At step two, the ALJ determined that Plaintiff had severe medical impairments related to symptoms of cervical and lumbar degenerative disc disease, obesity, and affective disorder.  *Id.* at 23.  Conversely, the ALJ noted that Plaintiff's thyroid disorder and gastroesophageal reflux disease "are effectively managed with medications" and that "[t]hese impairments do not cause more than minimal functional limitations and are not severe."  *Id.*

At step three, the ALJ found that none of Plaintiff's impairments met or equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 23–24.  The ALJ compared Plaintiff's impairments to Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), and 12.04 (depressive, bipolar, and related disorders).  AR 23–24.

The ALJ next considered the administrative record to arrive at Plaintiff's RFC.  *Id.*  Examining the objective medical evidence, opinions of physicians, and Plaintiff's testimony, the ALJ determined that Plaintiff could perform light work, with the additional caveats that Plaintiff used a cane for standing, walking, and balancing constantly, and that she required the option to alternate between sitting and standing.  *Id.*

In arriving at this RFC, the ALJ granted no weight to Dr. Marion's opinion that Plaintiff was disabled because Dr. Marion did not articulate "a basis for functional limitations that are consistent with [Plaintiff's] medical disorders, treatment history, and clinical presentation."  *Id.* at 32–33.  The ALJ accorded "great weight" to the opinions of Dr. Hemphill and Dr. Haim because, according to the ALJ, their "assessments are supported by the claimant's treatment records, examination findings, and activities of daily living."  *Id.*  Then, relying on the DOT and VE testimony, the ALJ found that Plaintiff was unable to perform any past relevant work given her RFC.  *Id.*

The ALJ then proceeded to step five and examined whether Plaintiff could perform other light work available in the national economy in light of her age, education, work experience, and RFC. *Id.* at 35–36. Again relying on the DOT and VE testimony, the ALJ found that Plaintiff was not disabled. *Id.* at 35–36.

## LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final decision of the Commissioner. 42 U.S.C. §§ 405(g), 1383(c)(3). The court has the authority to reverse or remand the Commissioner's decision if it is not supported by substantial evidence or is not made in accordance with applicable law or regulations. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Simms v. Sullivan*, 877 F.2d 1047, 1047 (D.C. Cir. 1989). The D.C. Circuit has instructed that "[i]f the case is one that involves the taking of additional evidence for any reason, the district court is obligated to obtain an enhancement or revision of the record by way of remand to the [Commissioner]" rather than outright reversal. *Callahan*, 786 F. Supp. 2d at 93402 us 401 (quoting *Ignoia v. Califano*, 568 F.2d 1383, 1389 (D.C. Cir. 1977)).

The plaintiff bears the burden to prove that the Commissioner's decision is not supported by substantial evidence. *Id.*; *see also Brown v. Barnhart*, 408 F. Supp. 2d 28, 31 (D.D.C. 2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It requires "more than a mere scintilla of evidence, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 315 F.3d 362, 365–66 (D.C. Cir. 2003). "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ." *Crosson v. Shalala*, 907 F. Supp. 1, 2 (D.D.C. 1995). The reviewing court may neither reweigh the evidence presented to it

nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own." *Id.* Rather, the reviewing court must determine whether the ALJ "has analyzed all evidence and has sufficiently explained that weight he has given to obviously probative exhibits." *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (quoting *Butler*, 353 F.3d at 999); *see also Butler*, 353 F.3d at 999 (noting that district court's role is not to reweigh evidence but only to determine whether ALJ's findings "are based on substantial evidence and a correct interpretation of the law").

## DISCUSSION

Plaintiff raises numerous challenges to the ALJ's decision. Plaintiff first claims that the ALJ erred by finding that Plaintiff did not satisfy one of the Commissioner's listed impairments. Pl. Mot. at 18–21. Plaintiff also argues that the ALJ improperly relied on the findings and opinions of State Agency physicians. Pl. Mot. at 35. Plaintiff further claims that the ALJ's RFC assessment was erroneous because he failed to give proper weight to the opinions of PA Scheer, Dr. Marion, and Dr. Krishnan. Pl. Mot. at 29–30. She argues that the ALJ's adverse credibility determination regarding her testimony is not supported by the evidence. Pl. Mot. at 25–26. Finally, Plaintiff asserts that substantial evidence does not support the ALJ's step five determination that there are a significant number of jobs in the national economy that Plaintiff can perform given her RFC and vocational background. Pl. Mot. at 22–23, 28–29. The undersigned finds that these contentions are without merit.

### A. The ALJ Reasonably Found that Plaintiff Did Not Satisfy One of the Commissioner's Listed Impairments

The ALJ found that the Plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." AR 23–24. The Listings are used in step three of the five-step sequential analysis to determine whether a

claimant's medical impairment is so severe that he or she would be found per se disabled.   20

C.F.R. §§ 404.1525(a), 416.925(a).   Plaintiff argues that she satisfies Listings 1.02 for major dys-

function of a joint, 1.04 for disorders of the spine, and 12.04 for depressive, bipolar, and related

disorders, and that the ALJ erred by holding otherwise.   Pl. Mot. at 18–21; AR 23–24.   The plaintiff

bears the burden of production and proof to demonstrate that she meets or equals a listing.   20

C.F.R. §§ 404.1520(a)(4)(iii), 416. 920(a)(4)(iii).

  *1.   Plaintiff's spine condition does not qualify as a disability under Listing 1.02*

The ALJ found that the evidence in the record did not establish that Plaintiff satisfied List-

ing 1.02.   AR 23.   Plaintiff argues that her cervical and lumbar degenerative disc disease is a listed

disability under Listing 1.02.   Listed impairment 1.02 is defined as:

> Major dysfunction of a joint(s) (due to any cause):   Characterized by gross anatom-
> ical deformity (e.g., subluxation, contracture, bony or fibrous ankyloses, instability)
> and chronic joint pain and stiffness with signs of limitation of motion or other ab-
> normal motion of the affected joint(s), and findings on appropriate medically ac-
> ceptable imaging of joint space narrowing, bony destruction, or ankyloses of the
> affected joint(s).   With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or an-
> kle), resulting in inability to ambulate effectively, as defined in 1.00B(2)(b); or
>
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder,
> elbow, or wrist-hand), resulting in inability to perform fine and gross movements
> effectively, as defined in 1.00B(2)(c).

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.02.

An "inability to ambulate effectively," as described in 1.02A, means "an extreme limitation

of the ability to walk."   20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00B(2)(b).   Ineffective

ambulation is further defined as "having insufficient lower extremity functioning … to permit

independent ambulation without the use of a hand-held assistive device(s) that limits the function-

ing of both upper extremities."   *Id.*

Here, the ALJ was correct in finding that Plaintiff does not satisfy part A of Listing 1.02 because she does not have a gross anatomical deformity of a major weight-bearing joint. The medical evidence in the record indicates that Plaintiff has no deformity of her lower extremities nor does she have limited range of motion. AR 330 (Dr. Marion examination, April 2015), 414 (Dr. Rice-Green progress note, November 2011), 430–31 (Dr. Yu evaluation, August 2012). Indeed, the evidence shows that Plaintiff has full range of motion in her lower extremities. *Id.* Moreover, while Plaintiff states she cannot ambulate effectively due to her use of a cane, this is insufficient under the regulatory definition, which requires an inability to walk without the use of assistive devices that limits both upper extremities, e.g., a walker. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 1.02A, 1.00B(2)(b). Therefore, the ALJ properly found that Plaintiff does not satisfy Listing 1.02A.

The ALJ's finding that Plaintiff has the ability to "perform fine and gross movements effectively" under Listing 1.02B is also supported by substantial evidence in the record. Pl. Mot. at 24. An "inability to perform fine and gross movements effectively" under Listing 1.02B is characterized by an "extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 1.02B, 1.00B(2)(c). As the ALJ found, the evidence shows that Plaintiff has full motor strength in her upper extremities, as well as a normal range of motion, intact sensation, and symmetrical reflexes. AR 330 (Dr. Marion examination, April 2015), 431 (Dr. Yu evaluation, August 2012). Plaintiff did not report any difficulty using her hands on her function report; rather, she handwrote and completed her own disability paperwork, and she reported that she could make simple meals, dust, and vacuum. *Id.* at 259–63 (function report, August 2012). Therefore, the ALJ's conclusion that Plaintiff failed to satisfy part

B of Listing 1.02 and that she was able to perform fine and gross movements effectively was supported by substantial evidence.  AR 330, 431.

    *2.   Plaintiff's spine condition does not qualify as a disability under Listing 1.04*

The ALJ found that the evidence in the record did not satisfy Listing 1.04 because "the record is devoid of evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis with accompanying ineffective ambulation."  AR 23.  Listed impairment 1.04 is defined as:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B(2)(b).

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04.

The ALJ properly found that Plaintiff did not satisfy Listing 1.04 because the medical evidence shows that Plaintiff has full strength in all four extremities, no atrophy, intact sensation, symmetrical reflexes, and negative straight-leg raising tests.  AR 330 (Dr. Marion examination, April 2015), 414 (Dr. Rice-Green progress note, November 2011), 430–31 (Dr. Yu evaluation,

August 2012).  Moreover, Plaintiff does not have spinal arachnoiditis[13] or pseudoclaudication[14] confirmed by diagnostic evidence.  *Id.* at 23.  Finally, as previously discussed, Plaintiff also does not have an inability to ambulate effectively.  Therefore, Plaintiff does not meet Listing 1.04 because she does not have the requisite motor loss accompanied by sensory or reflex loss and positive straight-leg tests.

   3.    *Plaintiff's psychotic depression does not qualify as a disability under Listing 12.04*

   The ALJ found that "[t]he severity of [Plaintiff's] mental impairment does not meet or medically equal the criteria of [L]isting 12.04."  AR 23–24.  Plaintiff argues that her psychotic depression qualifies as a disabling affective disorder under Listing 12.04, that the ALJ erroneously found that Plaintiff has only mild limitations in activities of daily living and only moderate limitations in social functioning, Pl. Mot. at 20–21, 24–25, that the ALJ failed to consider the combined effect of Plaintiff's mental and physical impairments, Pl. Mot. at 35–36, and that the ALJ failed to follow a "special technique" set forth in 20 C.F.R. §§ 404.1520a, 416.920a for evaluating mental impairments, *id.*

   To satisfy Listing 12.04, Plaintiff must satisfy the requirements of subparagraphs "A" and "B."  20 C.F.R. Pt. 404, Subpt. P., App. 1, §§ 12.00A, 12.04.  To meet the criteria in subparagraph "B," the mental impairment must result in at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked dif-

---

[13] "Arachnoiditis is a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord.  Arachnoiditis, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/arachnoiditis (last visited Dec. 6, 2017).

[14] "Pseudoclaudication can be a symptom of lumbar spinal stenosis, a condition that occurs when the spinal canal narrows in [the] lower back.  This narrowing can be caused by bulging disks, bone spurs or a thickening of the supportive ligaments in the back of the spinal canal."  What is the difference between pseudoclaudication and claudication?, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/expert-answers/pseudoclaudication/faq-20057779 (last visited Dec. 6, 2017).

ficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *Id.* at § 12.04B. A mild limitation "slightly" interferes with the ability to function "independently, appropriately, effectively, and on a sustained basis." *Id.* at § 12.00C(2)(b). A moderate limitation is characterized by "fair" functioning on an independent, appropriate, effective, and on a sustained basis. *Id.* at § 12.00C(2)(c). A marked limitation "seriously" interferes with the ability to function independently, appropriately, effectively, and on a sustained basis. *Id.* at § 12.00C(2)(d).

The ALJ concluded that Plaintiff had mild limitations in her activities of daily living. AR 24. Plaintiff argues that her psychotic depression caused marked limitations in her activities of daily living under paragraph B or Listing 12.04, not mild limitations as the ALJ found. Pl. Mot. at 24–25. The ALJ's finding is supported by evidence in the record because the ALJ found that Plaintiff's "statements as to the alleged severity of chronic pain are undermined by noncompliance with physical therapy, and [Plaintiff's] capacity to independently manage her household while living alone, as described in her functional report." AR 24. The record shows that Plaintiff performed her personal care needs and appeared neatly groomed at appointments. AR 340 (Dr. Krishnan progress note, September 2014). The record also reflects that Plaintiff lived alone. *Id.* at 462 (function report, August 2012), 471 (Dr. Siddique intelligence evaluation, July 2015). Plaintiff indicated in her August 2012 function report that she prepared simple meals daily, shopped in stores, attended church and a social group weekly, and did light household chores. *Id.* at 260–62. Moreover, any limitations Plaintiff alleged in performing activities of daily living were a result of physical limitations, rather than mental limitations, which does not further Plaintiff's claim that

she satisfies Listing 12.04.  *Id.* at 258–63 (function report, August 2012), 471 (Dr. Siddique intel-

ligence evaluation, July 2015).  The ALJ appropriately found that Plaintiff has mild limitations of

daily living.  *Id.* at 24.

Plaintiff also claims that the ALJ's finding that Plaintiff has only moderate limitations in

social functioning under Listing 12.04 is erroneous.  Pl. Mot. at 20–21.  The ALJ stated that while

Plaintiff "complains of chronic pain," according to Plaintiff's August 2012 function report, "her

family comes to see her more often."  AR 24.  While Plaintiff reported social isolation due to

depression and irritability, *id.* at 31, 342 (Dr. Krishnan progress note, October 2014), medical

sources described Plaintiff as a pleasant and friendly woman, who interacted calmly and coopera-

tively with good eye contact and normal speech, *id.* at 340 (Dr. Krishnan progress note, September

2014), 471 (Dr. Siddique intelligence evaluation, July 2015).  The record therefore supports the

ALJ's determination that Plaintiff has only moderate limitations in social functioning.  *Id.* at 24.

Plaintiff asserts that "the ALJ failed to properly consider the combined effects of [Plain-

tiff's] mental and physical impairments" because the ALJ did not "develop [Plaintiff's] mental

impairments in accordance with the relevant regulations."  Pl. Mot. at 35–36.  Plaintiff states that

the ALJ "disregarded the psychological effects of chronic pain and the interrelation of [Plaintiff's]

physical pain and depression." Pl. Mot. 36.

> In determining whether an individual's physical or mental impairment or impair-
> ments are of a sufficient medical severity that such impairment or impairments
> could be the basis of eligibility under this section, the Commissioner of Social Se-
> curity shall consider the combined effect of all of the individual's impairments
> without regard to whether any such impairment, if considered separately, would be
> of such severity.  If the Commissioner of Social Security does find a medically
> severe combination of impairments, the combined impact of the impairments shall
> be considered throughout the disability determination process.

42 U.S.C. § 423(d)(2)(B).  The ALJ is required to consider the cumulative effects of all of the

claimant's impairments and, if necessary, medications.  *Martin v. Apfel*, 118 F. Supp. 2d 9, 15

(D.D.C. 2000).  Furthermore, it is insufficient to individually list impairments and conclude that they are non-severe, instead, the ALJ "must make a particularized finding on the effect of combination of impairments and, if necessary, the medication that the claimant must take." *Id.* (finding that ALJ did not properly consider combined effect of claimant's ailments and medication because he did not consider medication that made claimant sleep three hours during day).

Here, the ALJ considered Plaintiff's cervical and lumbar degenerative disc disease, obesity, and affective disorder, and found that Plaintiff's impairments "do not cause more than minimal functional limitations and are not severe." *Id.* at 23.  Additionally, the ALJ considered whether Plaintiff has "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." *Id.* at 23. In determining the Plaintiff's RFC, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* at 24–34 (considering Plaintiff's physical and mental impairments, Plaintiff's own reports and testimony, Plaintiff's functional report, Plaintiff's medical record and treatment, and State Agency assessments).  The ALJ explicitly discussed the mental health findings of Dr. Krishnan and Dr. Siddique.  *Id* at 31–32.  Specifically, the ALJ noted that "Dr. Siddique opined that mild cognitive problems were not significant enough to interfere with daily function.  Rather, [Plaintiff] was primarily limited by physical impairments due to back pain and sedating medications." *Id.* at 32.

Finally, Plaintiff argues that the ALJ failed to follow a "special technique" set forth in 20 C.F.R. §§ 404.1520a, 416.920a for evaluating mental impairments.  Pl. Mot. at 35–36.  This technique requires that the ALJ "first evaluate [the claimant's] pertinent symptoms, signs, and labora-

tory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   If there is a medically determinable mental impairment, the ALJ then rates the degree of limitations in functional areas (activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) to determine if the claimant has a severe mental impairment and if the claimant meets a listing.  20 C.F.R. §§ 404.1520a, 416.920a.  If the ALJ finds a severe mental impairment that does not meet a mental listing, the ALJ then assesses any restrictions caused by the claimant's mental impairments when determining the claimant's RFC.   20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3).

Here, the ALJ properly followed the special technique for evaluating mental impairments. He first considered Plaintiff's subjective complaints of mental symptoms, as well as the clinical findings on Plaintiff's mental status examination.  AR 23–24.  The ALJ then rated Plaintiff's functional limitations in the broad functional areas:  mild limitations in activities of daily living, moderate limitations in social functioning, mild limitations in concentration, persistence, or pace, and no episodes of decompensation.  *Id.* at 24.  The ALJ found that Plaintiff had a severe affect disorder that did not meet or equal Listing 12.04, thus the ALJ went on the assess Plaintiff's RFC.  *Id.* at 24–34.  Accordingly, the ALJ properly followed the special technique for evaluating mental impairments and there was no error.  In any event, the ALJ went on to the next step, thus there was no prejudice.

## B.  The ALJ Did Not Err in Evaluating the Findings and Opinions of State Agency Physicians

Plaintiff argues that the ALJ improperly found that the assessments of Dr. Hemphill and Dr. Haim "are supported by [Plaintiff's] treatment records, examination findings, and activities of daily living" and therefore accorded them "great weight."  AR 33; Pl. Mot. at 35.  The ALJ may

give weight to the State Agency opinions "only insofar as they are supported by evidence in the case record." SSR 96-6P (S.S.A.), 1996 WL 374180.  Here, the State Agency physicians' opinions were consistent with Plaintiff's medical records.  AR 29–33.  Drs. Hemphill and Haim opined that Plaintiff could perform a range of light work.  *Id.*  This finding is consistent with the findings of Plaintiff's primary care physicians who found that Plaintiff had full motor strength in all muscle groups in her upper and lower extremities, full range of motion in all extremities, no atrophy or asymmetry, and intact sensation and symmetrical reflexes.  *Id.* at 330, 414, 430–31.  Therefore, the ALJ properly relied on the statements of the State Agency physicians.

Plaintiff also claims that the State Agency opinions of Drs. Hemphill and Haim "are outdated and superseded by more recent evaluations by [Plaintiff's] treating medical providers Scheer and Krishnan and the other medical providers at Unity Health Care."  Pl. Mot. 35.  It is within the ALJ's discretion to determine whether new expert medical opinions are required when deciding whether a claimant meets or equals an impairment listing.  *See* SSR 96-6P (S.S.A.), 1996 WL 374180.  The ALJ is required to obtain an updated medical opinion from a medical expert when (1) the ALJ finds that a judgment that the claimant's impairments equal a Listing may be reasonable based on information in the record, or (2) when additional medical evidence may change a State Agency medical expert's finding that an impairment is not equivalent to an impairment listing.  SSR 96-6P (S.S.A.), 1996 WL 374180.  To determine a claimant's RFC, the ALJ "must consider and evaluate any assessment of the individual's RFC by a State Agency medical or psychological consultant and by other program physicians or psychologists."  *Id.*  The opinions from State Agency physicians are considered medical opinions from non-examining sources.  *Id.*

Here, Dr. Hemphill conducted his assessment of Plaintiff on September 11, 2012, AR 64–71, and Dr. Haim conducted the State Agency reconsideration review on March 25, 2013, *id.* at

82–90.  In his reconsideration, Dr. Haim reviewed all of Plaintiff's medical treatment notes, along with additional medical treatment evidence through February 2013.  *Id.*  In determining Plaintiff's RFC, the ALJ found that "[t]he State Agency assessments are supported by [Plaintiff's] treatment records, examination findings, and activities of daily living."  AR 33.

The ALJ also considered additional medical evidence subsequent to Dr. Haim's February 2013 assessment.  *Id.* at 30–32.  The ALJ considered the mental health examinations from Dr. Krishnan.  *Id.* at 31.  In September 2014 and October 2014 when Plaintiff complained of auditory and visual hallucinations, social isolation, and depression, Dr. Krishnan found no evidence of psychotic symptoms and prescribed Sertraline and Risperdal to treat Plaintiff's depressive symptoms. *Id.* at 339–340, 343.  The ALJ also considered the examination from Dr. Marion from April 2015. *Id.* at 30.  According to those findings, Plaintiff "had full and active range of motion of all four extremities," "[t]here was no extremity atrophy or symmetry," "[j]oint examination did not demonstrate any significant clubbing, cyanosis or edema," and Plaintiff had full strength in her upper and lower extremities.  *Id.* at 330.  Dr. Marion also noted that Plaintiff had "generalized muscle tenderness to palpation."  *Id.*  As discussed in further detail below, the ALJ granted Dr. Marion's examining opinion limited weight because Dr. Marion did not provide an opinion regarding Plaintiff's functional limitations.  *Id.* at 33.  Finally, the ALJ considered Plaintiff's Home Health Care Plan from Global Healthcare, *id.* at 30, along with the examination and report from PA Scheer in March 2015, *id.* at 31–32.

After the hearing, the ALJ requested that Dr. Siddique conduct an intelligence evaluation and cognitive testing on behalf of the State Agency and then used those findings to assess Plaintiff's mental impairments under Listing 12.04 and to determine Plaintiff's RFC.  AR 22–26, 32. Because there were no significant physical health findings after the assessments of Drs. Hemphill

and Haim and because Dr. Siddique conducted a mental health examination, the ALJ properly found that the opinions of Drs. Hemphill and Haim were neither outdated nor superseded by updated medical records.

Plaintiff contends that Dr. Hemphill's report was contradictory because in one sentence, Dr. Hemphill observed that Plaintiff had "no difficulties standing or walking" and then later noted that Plaintiff's function report indicated that she was unable to stand or walk more than thirty minutes.  Pl. Mot. at 35; AR 67.  Dr. Hemphill's note that Plaintiff was unable to stand or walk more than thirty minutes was not Dr. Hemphill's opinion, but rather documentation of Plaintiff's own report, as indicated by the label "function report" in Dr. Hemphill's analysis. AR 67.  In the section of his analysis labeled field office observations, Dr. Hemphill wrote that he observed that Plaintiff had no difficulties standing or walking.  *Id.*  Therefore, Dr. Hemphill's report and opinion were not contradictory.

### C. Substantial Evidence Supports the Weight the ALJ Afforded to the Opinions of PA Scheer, Dr. Marion, and Dr. Krishnan

Plaintiff contends that the ALJ's RFC assessment was flawed because he failed to give proper weight to the opinions of PA Scheer, Dr. Marion, and Dr. Krishnan.[15]  Pl. Mot. at 29–30. It is the role of the ALJ to evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527, 416.927; *Brown v. Barnhart*, 370 F. Supp. 2d 286, 288 (D.D.C. 2005).  The ALJ found that PA Scheer's opinion "cannot be fully credited" because PA Scheer reported that Plaintiff used a cane "out of medical necessity," and yet reported that Plaintiff "could walk one mile without it."  AR 31.  The ALJ granted no weight to Dr. Marion's opinion that Plaintiff was totally disabled and limited weight to Dr. Marion's examining opinion. AR 32–33.  In his decision, the ALJ did not discuss the weight

---

[15] The ALJ considered the findings of Dr. Henry, Dr. Rice-Green, and PA Duong, AR 24–34, but these medical providers did not issue medical opinions.

he gave to Dr. Krishnan, however, the ALJ discussed Plaintiff's appointments with Dr. Krishnan along with Dr. Krishnan's findings and treatment recommendations.  AR 31.

In evaluating the weight of medical opinions, the ALJ considers whether the opinion is supported by medical evidence and whether the opinion is consistent with treatment records and the record as a whole.  20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6).  The ALJ is responsible for making the disability and RFC determinations.  20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3).

A physician assistant's opinion is not entitled to controlling weight because PAs are not considered "acceptable medical sources" under the SSA regulations and cannot offer treating source medical opinions.  *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).  Therefore, PA Scheer's opinions are not entitled to controlling weight.  *See* 20 C.F.R. §§ 404.1513(d), 416.913(d).  While the SSA published a rule on January 18, 2017, stating that PAs will be recognized as acceptable medical sources for claims filed on or after March 27, 2017, 82 Fed. Reg. 5844–46 (Jan. 18, 2017), Plaintiff's claim was filed before March 27, 2017.  Therefore, the ALJ was not required to recognize PA Scheer as an acceptable medical source for purposes of Plaintiff's claim.

Also, PA Scheer's opinion was inconsistent with the opinions of State Agency physicians, Dr. Hemphill and Dr. Haim, which the ALJ appropriately determined were entitled to more weight given the other evidence in the record.  AR 76–77, 87–88.  Additionally, the ALJ found that PA Scheer did not provide any "clinical findings, or other rationale" to support her opinion that Plaintiff could not perform cleaning work as a laborer, care aide, recreational aid, or security guard.  *Id.* at 32, 324.

Plaintiff argues that the ALJ's attack on the credibility of PA Scheer was based on the ALJ's erroneous belief that PA Scheer reported that Plaintiff could walk one mile *without* a cane

when, in fact, PA Scheer opined that Plaintiff could walk one mile *with* a cane.  *Id.* at 323.  To the ALJ, this statement was inconsistent with other functional limitations in PA Scheer's report and undermined PA Scheer's credibility.  *Id.* at 33; Pl. Opp. at 12.  This error is harmless because the ALJ nonetheless incorporated use of a cane into Plaintiff's RFC:  "the claimant has the residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b), 416.967(b) except the claimant uses a cane for standing, walking, and balancing constantly."  AR 24.

Here, the ALJ appropriately rejected PA Scheer's letter on the ground that it was "unsupported by any concurrent clinical findings or functional analysis."  *Id.* at 32.  PA Scheer's opinion was inconsistent with the medical evidence which showed that Plaintiff had full range of motion and strength in her lower extremities and that Plaintiff failed to follow through with conservative treatment recommendations.  *Id.* at 330, 402, 414, 430–431.

The ALJ also appropriately found that Dr. Marion's opinion that Plaintiff was "totally disabled" was an issue reserved to the ALJ and thus entitled to no weight.  *Id.* at 32.  Dr. Marion's opinion that Plaintiff was "totally disabled" was not a medical opinion, but an opinion on an administrative issue.  *See* 20 C.F.R. § 404.1527(d), 416.927(d).  Furthermore, Dr. Marion's opinion was not entitled to controlling weight because he performed a single examination on Plaintiff and therefore may not be considered a treating source under the regulations.  *Id.* at 327.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).  With respect to Dr. Marion's opinion, the ALJ found that "the opinion concludes that [Plaintiff] is disabled without articulating a basis for functional limitations that are consistent with her medical disorders, treatment history, and clinical presentation."  *Id.* at 33.  Thus, the ALJ properly granted Dr. Marion's examining opinion limited weight because the opinion was conclusory and Dr. Marion did not provide an opinion on Plaintiff's functional limitations.

Plaintiff further argues that the ALJ failed to give substantial weight to the reports of mental impairment from Dr. Krishnan.  Pl. Opp. at 18–20.  In his determination of Plaintiff's RFC, the ALJ discussed Plaintiff's September 2014 and October 2014 appointments with Dr. Krishnan, along with Dr. Krishnan's findings and treatment recommendations.  *Id.* at 31.  The ALJ also noted that the medical records from Dr. Krishnan evidence a mental impairment and the ALJ stated that Dr. Krishnan's opinion was "credited in the established residual functional capacity."  *Id.* at 34.  Therefore, the ALJ did not fail to give appropriate weight to Dr. Krishnan's reports.

### D.  Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Credibility

The ALJ found that Plaintiff statements about the severity of her symptoms and functional limitations "cannot be fully credited" because Plaintiff was noncompliant with recommended treatment and because medical opinion evidence did not support Plaintiff's assessment of her symptoms.  AR 27–28.  Plaintiff argues that the ALJ's adverse credibility determination regarding Plaintiff's testimony is not supported by substantial evidence.  Pl. Mot. at 25–26.  The Commissioner's regulations require an ALJ to engage in a two-step process to determine the credibility of a claimant's evaluation of the limiting effects of his or her symptoms.  SSR 96-7P, 1996 WL 374186, at *2.[16]  First, the ALJ must consider whether there is an "underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms."  *Id.*  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  *Id.*

At this second step, the ALJ evaluates a claimant's credibility regarding the alleged limiting effects of her symptoms "based on a consideration of the entire record."  *Id.*  The credibility

---

[16] SSR 96-7p was in effect at the time of the ALJ's decision on September 15, 2015.  SSR 96-7p was later superseded by SSR 16-3p.  SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

determination is "solely within the realm of the ALJ" and a "reviewing court will only intercede where an ALJ fails to articulate a rational explanation for his or her finding." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012).   Therefore, "deference should be given to the ALJ in the determination of whether a claimant's alleged pain is credible, allowing the ALJ to weigh some opinions more heavily than others."   *Thomas v. Astrue*, 677 F. Supp. 2d 300, 308 (D.D.C. 2010). "It is not sufficient for the adjudicator to make a single, conclusory statement" that the claimant is not credible; instead, the determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   SSR 96-7P, 1996 WL 374186, at *2.

Here, substantial evidence supports the ALJ's credibility assessment.   First, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."   AR 26.   At the second step, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   *Id.*   In support of his adverse credibility determination, the ALJ discussed clinical evidence, the extent of Plaintiff's course of treatment, Plaintiff's failure to follow prescribed treatment, and inconsistencies between Plaintiff's statements and information in the record.   *Id.* at 26–27.

Plaintiff argues, again, that the ALJ relied on outdated findings regarding Plaintiff's daily living and reasons that a deterioration in Plaintiff's condition in October 2013 explains inconsistencies in Plaintiff's activities of daily living.   Pl. Mot. at 32–33.   The ALJ discussed that Plaintiff "has mild restriction" in activities of daily living.   AR 24.   The ALJ noted that Plaintiff's statements about her limitations are "undermined by noncompliance with physical therapy, and [her]

capacity to independently manage her household while living alone." *Id.* at 24, 27.  He also found that Plaintiff "is moderately limited in social interaction." *Id.* at 24.  The ALJ noted that while Plaintiff complains of chronic pain, her August 2012 function report indicates that "family members came to see her more often" and "[s]he attended church every Sunday and she went to social groups once per week." *Id.* at 24, 27.

With regard to Plaintiff's claim that her condition was worsening, the ALJ found that "while [Plaintiff] was not using a cane in August 2012" when she completed her function report, "the later cane usage at the hearing in 2015 is consistent with increasing limitations due to degenerative disc disease." *Id.* at 27.  The ALJ further found that "the abilities [Plaintiff] admitted in August 2012 [when she filled out her function report,] undermine the reliability of statements as to the alleged disabling severity of symptoms and limitations due to chronic pain since September 2011 [Plaintiff's onset date,] notwithstanding any contribution from obesity." *Id.*  Finally, the ALJ found, "[t]hat the claimant was taking no psychotropic medication at the time of the functional report [in August 2012] undermines the credibility of allegations as to the severity of psychiatric symptoms and resulting functional limitations as of the alleged [September 2011] onset date." *Id.*  Given the Plaintiff's onset date and functional report, the ALJ properly found that the inconsistencies in Plaintiff's reports of her activities of daily living, along with the medical evidence, undermined her credibility.  *Id.* at 24, 27.

Plaintiff claims that the ALJ erroneously rejected evidence of psychosis based on speculation of Plaintiff's cocaine use, which last occurred in October 2013.  Pl. Mot. at 37; AR 28, 451.  The ALJ noted in his opinion that while Plaintiff's cocaine use "supports an inference that psychiatric symptoms . . . are related to the influence of substance abuse, rather than arising from other mental illnesses . . . [t]his finding does not necessarily mean that the claimant has no subjective

symptoms." *Id.* at 28.  The ALJ indicated that Plaintiff was "not a reliable historian" and stated

that "[r]educed credibility means that when the degree of alleged limitations associated with sub-

jective symptoms is in doubt[,] claimant assertions, by themselves, will not suffice to bolster the

evidentiary weight up to the level of a preponderance of evidence." *Id.*  When Plaintiff sought out

treatment, she reported symptoms of hallucinations, but Dr. Krishnan found no psychotic symp-

toms on examination.  *Id.* at 340, 342, 474.  Dr. Krishnan told Plaintiff to return for a follow-up,

but there is no evidence in the record that Plaintiff continued with treatment.  *Id.* at 340, 342.  Thus,

the ALJ did not reject evidence of psychosis based on speculation about cocaine use, but rather

rejected it based on substantial evidence in the record.

### E.  Substantial Evidence Supports the ALJ's Finding that Plaintiff Could Perform Work that Existed in Significant Numbers in the National Economy

Finally, Plaintiff argues that substantial evidence does not support the ALJ's step five de-

termination that there are a significant number of jobs in the national economy that Plaintiff can

perform with her RFC and vocational profile.  Pl. Mot. at 22–23, 28–29.  To make this determina-

tion, the ALJ may elicit testimony from a VE through hypothetical questions that incorporate a

claimant's physical and mental impairments that the ALJ accepts as credible and are supported by

the record.  *See Turner v. Colvin*, 964 F. Supp. 2d 21, 36 (D.D.C. 2013).  Testimony elicited in

this manner constitutes substantial evidence for the ALJ's step five determination.  *Id.*

Here, the ALJ reasonably found that Plaintiff could perform a significant number of jobs

in the national economy given Plaintiff's RFC, vocational profile, and the VE testimony.  The ALJ

posed hypothetical questions to the VE that incorporated Plaintiff's physical and mental limitations

consistent with the RFC assessment.  AR 57–59.  The VE testified that Plaintiff was capable of

performing light jobs that exist in significant numbers in the national economy, such as counter

clerk, office helper, and router.  *Id.*  The VE's testimony provided substantial evidence that sup-ported the ALJ's finding that Plaintiff was not disabled and could perform work that exists in the national economy.

Plaintiff contends that there are no jobs in the national economy that she could perform because the VE testified that a person who cannot sit, stand, or walk without interruption for more than thirty minutes in an eight-hour day cannot perform any job in the U.S. economy.  Pl. Mot. at 22–23.  The VE testified that Plaintiff would be able to perform the proffered jobs even if she could not stand for more than thirty minutes in an eight-hour shift because sit-stand options were available.  AR 59–61.  In response to a second question posed by Plaintiff's counsel, the VE testi-fied that a hypothetical person was not capable of any full-time employment if she was not able to sit or stand for more than an hour in an eight-hour period.  *Id.*  The ALJ, however, properly rejected the latter limitation proffered by Plaintiff's counsel because it was inconsistent with substantial evidence in the record.  *Id.* at 33.

The ALJ granted no weight to the independent vocational opinion of Nancy Forest.  *Id.* at 36.  Plaintiff argues that the ALJ's decision to give "no weight" to that vocational report is unsup-ported.  Pl. Mot. at 28–29.  However, the ALJ explained that Ms. Forest was not reliable because her opinion "does not account for occupations that can be performed by a hypothetical individual with the same age, education, work experience, and residual functional capacity as [Plaintiff]."  AR 36.  The ALJ further stated that Ms. Forest's opinion was "based upon an assessment of limi-tations and abilities proposed by [Plaintiff's] attorney that are not consistent with the medical and other evidence supporting the established residual functional capacity."  *Id.*  The ALJ therefore properly rejected the vocational evidence from Ms. Forest.

## CONCLUSION

For the reasons stated above, the undersigned finds that the ALJ's decision is supported by substantial evidence and the ALJ reached his judgment through a proper application of the law. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's motion be **DENIED** and that Defendant's motion be **GRANTED**.

*     *     *     *     *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to timely file objections to the findings and recommendations set forth in this report may waive the right of appeal from an order of the District Court adopting such findings and recommendations. *See Thomas v. Arn*, 474 U.S. 140 (1985).


Date:  December 8, 2017                    _____

                                           G. MICHAEL HARVEY
                                           UNITED STATES MAGISTRATE JUDGE